**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| MSR TECHNOLOGY GROUP, LLC, | |
| Plaintiff, | |
| v. | Case No. __ 1:24-cv-3203____ |
| VISTALTECH, INC.; MASTAN REDDY PAIDELA; VAGDEVI SATKURI; MOULI PRASAD DONIPATHI; KAPILESWAR REDDY JUTUR, and DOES 1–99 | |
| Defendants. | |

## PLAINTIFF MSR TECHNOLOGY GROUP, LLC'S COMPLAINT

Plaintiff MSR Technology Group, LLC ("MSR"), through undersigned counsel, and for its Complaint against Defendants VistalTech, Inc. ("VistalTech"), Mastan Reddy Paidela ("Paidela"), Vagdevi Satkuri ("Satkuri"), Mouli Prasad Donipathi ("Donipathi"), Kapileswar Reddy Jutur ("Jutur") (Paidela, Satkuri, Donipathi, and Jutur, the "Individual Defendants") (collectively with VistalTech, the "Defendants"), and DOES 1–99, states the following:

### NATURE OF THE CASE

1.      Paidela sold numerous entities to MSR, but post-sale created a rival company through which Paidela has poached MSR's customers and employees.  This is an action for breach of contract, breach of fiduciary duty, and conspiracy for the brazen poaching of MSR employees and customers spearheaded by the Individual Defendants while they were still employed by MSR, for their rival company, VistalTech, as well as for tortious interference with contract and prospective economic advantage against VistalTech—a company formed by Individual Defendants to directly compete with MSR while they were still employed at MSR.  By this action, MSR seeks, *inter alia*, to enjoin each of the Defendants from continuing to solicit MSR employees

and customers, as well as from commencing or continuing work on behalf of MSR's customers whom they have already solicited in breach of their fiduciary and contractual obligations to MSR.

## PARTIES[1]

2.      Plaintiff MSR Technology Group, LLC is a Delaware limited liability company with its principal places of business in Seattle, Washington, and its sole LLC member is an individual who resides in Seattle, Washington.  MSR is a leading provider of expert information technology ("IT") consulting services and staffing to businesses of all sizes.  Its team of expert consultants have a wealth of knowledge and expertise in a wide range of IT fields, including cloud computing, ERP, Data and AI, software development, and network infrastructure.

3.      Defendant Mastan Reddy Paidela is an individual who, upon information and belief, resided in Springfield, Illinois, but as of May 2023, relocated to Trinity, Florida.  On November 27, 2020, MSR and Paidela entered into a Securities Purchase Agreement (the "Purchase Agreement") whereby MSR purchased the following companies owned by Paidela for $15,000,000 (among other consideration):   Infomatics Inc. ("Infomatics"), Synapsis, Inc. ("Synapsis"), Riverpoint Management, LLC ("RPM"), Riverpoint Group, LLC ("RPG"), and Riverpoint Group of Illinois, LLC ("RPI") (RPM, RPG, and RPI, collectively, the "Riverpoint Companies") (Infomatics, Synapsis, and Riverpoint Companies, collectively, the "Acquired Companies").  Concurrent with the Purchase Agreement, MSR and Paidela entered into an employment agreement ("Paidela Employment Agreement") whereby Paidela would remain employed by the Acquired Companies and therefore by MSR.  Others of Paidela's entities'

---

[1] The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1–99, inclusive, are unknown to MSR at this time, and thus MSR sues said Defendants by such fictitious name.  When MSR ascertains their true names and capacities, MSR will seek leave of the Court to amend this Complaint accordingly.

employees also remained employed by the Acquired Companies, making them employees of MSR. Paidela was an employee of MSR until April 22, 2024, when he was terminated for cause.

4.    Defendant Vagdevi Satkuri is an individual who, upon information and belief, resides in Wheeling, Illinois.  Satkuri was an employee of MSR, specifically with Riverpoint Management, until April 22, 2024, when she was terminated for cause.  Upon information and belief, Satkuri is also the Secretary and Registered Agent of VistalTech.

5.    Defendant Mouli Prasad Donipathi is an individual who, upon information and belief, resides in Buffalo Grove, Illinois.  Donipathi was an employee of MSR, specifically with Synapsis, until April 22, 2024, when he was terminated for cause.  Upon information and belief, Donipathi is also the President of VistalTech.

6.    Defendant Kapileswar Reddy Jutur is an individual who, upon information and belief, resides in Buffalo Grove, Illinois.  Jutur was an employee of MSR, specifically with Synapsis, until April 22, 2024, when he was terminated for cause.  Upon information and belief, Jutur is also the Director of VistalTech.

7.    Defendant VistalTech, Inc. is an Illinois corporation that was created on March 3, 2022, and its principal place of business is in Buffalo Grove, Illinois.  Upon information and belief, Paidela is the owner of VistalTech.

**JURISDICTION AND VENUE**

8.    The Court has original subject matter jurisdiction of this action under 28 U.S.C. section 1332(a)(1) in that this is a civil action between citizens of different states where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.    Venue is proper in this judicial district under 28 U.S.C. section 1391, because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this

judicial district and because this Court has personal jurisdiction over Defendants in this judicial district.

## FACTUAL BACKGROUND

**A.     MSR Technology Group, LLC's Origins And Founding.**

10.     MSR was founded by SivaGopal Modadugula (Chief Strategy Officer and Chairman) and Devi Kondapi (Chief Executive Officer) in 2008.  Both Mr. Modadugula and Ms. Kondapi are former executives and technologists with SAP SE and HANA Microelectronics PCL (SAP Labs USA in Palo Alto, California).  They are also husband and wife.

**B.     MSR And Paidela Negotiate for The Sale of The Acquired Companies for Fifteen Million Dollars.**

11.     In November 2019, MSR learned that Paidela was considering selling his companies, so MSR reached out to Paidela to express interest.  The conversations lasted three months.  Paidela represented to MSR that he allegedly intended to retire in a few years because it was hectic managing three companies in different locations and that he had been traveling every week to all locations to manage the teams.  MSR executed a Letter of Intent with Paidela and then the Purchase Agreement on November 27, 2020.

12.     On December 2, 2020, MSR completed its acquisition, via stock purchase, of the Acquired Companies, which acquisition included the Acquired Companies' operations, goodwill, and then-current employees.  At that point, the Acquired Companies became subsidiaries of MSR, with no changes in staffing or operations, including with Paidela continuing to manage the Acquired Companies.  Paidela and the Acquired Companies' other employees thereby became employees of MSR.

13.     Section 9.3(a) of the Purchase Agreement, entitled "Non-Competition," states as follows:

Seller agrees and acknowledges that he is familiar with the trade secrets and other information of a confidential or proprietary nature of the Acquired Companies, their respective businesses (including the Business) and their respective business relations. **Seller also agrees and acknowledges that Purchaser and his Affiliates (including the Acquired Companies) would be irreparably damaged if Seller or any of his Affiliates were to provide services or to otherwise participate in the operations or business of any Person competing with the businesses of the Acquired Companies in a similar business and that any such competition would result in a significant loss of goodwill by Purchaser in respect of such businesses.** Seller further agrees and acknowledges that (i) the covenants and agreements set forth in this Section 9.3 are: (a) a material inducement to Purchaser to enter into this Agreement and to perform its obligations hereunder, (b) fundamental and essential for the protection of the legitimate business and proprietary interest of Purchaser and its Affiliates, and (c) are necessary to ensure that Purchaser and its Affiliates would obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the parties hereto, such benefit of the bargain which would not be realized if Seller breached any of the provisions of this Section 9.3, (ii) in order to assure Purchaser that the Acquired Companies' businesses and the Acquired Securities will retain their value, it is necessary that Seller undertake not to utilize his special knowledge of the business of the Acquired Companies and his relationship with their clients or customers to compete with Purchaser in the Restricted Business for the Restricted Period (as referred to in Section 9.3(a), and (iii) but for such provisions set forth in this Section 9.3, Purchaser would not have entered into, or consummated the transactions under, this Agreement. Therefore, in further consideration of the amounts to be paid hereunder on the Closing Date in exchange for Seller's sale of all of the Acquired Securities held by Seller, and the goodwill of the businesses of the Acquired Companies sold in connection therewith, **Seller agrees that from and after the Closing Date and continuing during the seven (7) years thereafter (the "Restricted Period"), Seller shall, and shall cause each of his Affiliates, not to, directly or indirectly, either for himself, or itself or through any other Person, as an employee, agent, consultant, director, equityholder, manager, member, co-partner or in any other individual or representative capacity, own, operate, manage, control, engage in, invest in, be employed by or participate in any manner in, act as an employee, consultant or advisor to, render services for (alone or in association with any Person), permit his name to be used by any enterprise that engages in or participates in, or otherwise assist any Person that engages in or owns, invests in, operates, manages or controls any business or activities that are directly or indirectly competitive with the Business or the services provided by Purchaser (the "Restricted Business").** Nothing contained herein shall be construed to prevent Seller from owning less than one percent (1%) of the combined voting power of all issued and outstanding voting securities of any publicly held corporation whose stock is traded on a major stock exchange or quoted on NASDAQ. In addition, nothing contained herein shall be construed to prevent Seller from entering into an employment agreement with Purchaser or its Affiliates

to be employed as an employee or independent contractor to provide services to one or more of the Acquired Companies.

14.      Section 9.3(b) of the Purchase Agreement, entitled "Non-Solicitation of Business Relationships," states as follows:

Seller hereby agrees that during the Restricted Period Seller shall not, and shall cause each of his Affiliates not to, directly or indirectly, through another Person, as employee, agent, consultant, director, equityholder, manager, member, co-partner or in any other capacity, without Purchaser's prior written consent, (i) solicit business from any Person which is or was a client, customer, supplier, licensee, licensor or other business relation of the Acquired Companies during the two (2) year period preceding the Closing Date, or from any successor in interest to any such Person, in any case for the purpose of securing business or contracts related to the Restricted Business or (ii) encourage, initiate or participate in discussions or negotiations with, provide any information to any Person which is or becomes an acquisition target, client, customer, supplier, licensee, licensor or other business relation of the Acquired Companies or the Restricted Business (including any Person engaged in discussions with the Acquired Companies related to such Person becoming a client, customer, supplier, licensee, licensor or other business relation of the Restricted Business) with respect to the termination or other alteration of such Person's relationship (or potential relationship) with Purchaser, the Acquired Companies or the Restricted Business.

15.      Section 9.3(c) of the Purchase Agreement, entitled "Non-Solicitation and No-Hire of Employees," states as follows:

During the Restricted Period, Seller shall not, and shall cause each of his Affiliates, not to, directly or indirectly, as employee, agent, consultant, director, equityholder, manager, member, co-partner or in any other capacity, without the prior written consent of Purchaser, employ, hire, engage, recruit or solicit for employment or engagement (other than by a general solicitation advertisement, posting or similar job solicitation process not targeting the employees of the Acquired Companies), any Person who is (or was during the one (1) year period preceding the Closing Date or the one (1) year period prior to the solicitation) employed or engaged by the Acquired Companies with respect to the Acquired Companies' business or a client or customer of such business, or otherwise seek to interfere with, influence or alter any such Person's relationship with any of the foregoing; provided, that, notwithstanding the foregoing, Seller may hire any former employee of the Acquired Companies if such hiring occurs at least one (1) year after such employee's final day of employment with the Acquired Companies.

16.     Section 9.3(d) of the Purchase Agreement, entitled "No Impairment to Value," states as follows:

> Seller shall not, and shall cause each of his Affiliates, not to, directly or indirectly, as employee, agent, consultant, director, equityholder, manager, member, co-partner or in any other capacity, take any action that would impair the value of the Acquired Companies or the Business or the assets of Purchaser or any of its Affiliates including any action that would tend to disparage or diminish the reputation of the Acquired Companies, the Business, Purchaser or any of its Affiliates.

17.     Section 3.13(a) of the Purchase Agreement stated that "no executive, manager contractor or key employee of the Acquired Companies (A) have any intention to terminate his or her employment within the first twelve (12) months following the Closing Date, or (B) are a party to any confidentiality, non-competition, proprietary rights or other such agreements between such employee and any Person besides such entity that would be material to the performance of such employee's employment duties or the ability of such entity or any Purchaser to conduct such entity[.]"

18.     Section 6.3(j) of the Purchase Agreement stated that Paidela shall not "transfer any employee to any other business of Seller[.]"

19.     Section 6.3(v) of the Purchase Agreement stated that Paidela shall not "take any action that is designed or intended to, or would be reasonably expected to, have the effect of discouraging any officer, director/manager, manager, employee, consultant, contractor, agent, customer, vendor, supplier, distributor, lessor, lender, Governmental Entity or other Person having a business relationship with the Business from maintaining the same business relationship with the Business and any Acquired Company after the Closing in the manner such relationship was maintained prior to the Acquired Closing[.]"

20.     Section 9.3(f) of the Purchase Agreement, entitled "Remedies," states as follows:

**Seller acknowledges and agrees that the covenants set forth in this Section 9.3 hereof are reasonable and necessary for the protection of Purchaser's and the Acquired Companies' business interests, that irreparable injury will result to Purchaser and/or the Acquired Companies if Seller breaches any of the terms of this Section 9.3, and that in the event of Seller's actual or threatened breach of any of the provisions contained in this Section 9.3, Purchaser will have no adequate remedy at law**. Seller accordingly agrees that **in the event of any actual or threatened breach by either of them of any of the provisions contained in this Section 9.3, Purchaser shall be entitled to the following rights and remedies, each of which rights and remedies shall be independent of the others and severally enforceable:  (i) such injunctive and other equitable relief as may be deemed necessary or appropriate by a court of competent jurisdiction** and (ii) the right and remedy to require Seller to account for and pay over to Purchaser any profits, monies, accruals, increments or other benefits derived or received by Seller as the result of any transactions or conduct constituting a breach of any of the provisions contained in this Section 9.3.  Nothing contained herein shall be construed as prohibiting Purchaser from pursuing any other remedies available to him (whether at law or in equity) for such breach or threatened breach, including the recovery of any damages which it is able to prove.  Seller agrees that he will not oppose the granting of an injunction, specific performance and other equitable relief as provided herein on the basis that (x) each of the parties has an adequate remedy at law, (y) an award of specific performance is not an appropriate remedy for any reason at law or equity or (z) such remedy is unavailable as a result of any Purchaser Indemnified Party's breach or alleged breach of this Agreement or any other agreement contemplated hereby.

21.     Section 10.3 of the Purchase Agreement, entitled "Remedies," states as follows:

Except as expressly provided in this Agreement, [MSR] shall be entitled to enforce any of its rights under any provision of this Agreement specifically, to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by applicable Laws.  All such rights and remedies shall be cumulative and non-exclusive, and may be exercised singularly or concurrently. [Paidela] hereby agrees that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached by [Paidela]:  (a) irreparable damage would occur to [MSR], (b) no adequate remedy at law would exist and damages would be difficult to determine, and (c) that [MSR] shall be entitled to specific performance of the terms hereof; accordingly, in addition to any other right or remedy to which [MSR] may be entitled, at law or in equity, [MSR] shall also be entitled to enforce any provision of this Agreement by a decree of specific performance and to temporary, preliminary, and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement, ***without posting any bond or other undertaking***.

22.     Following its November 27, 2020, execution, MSR performed in full all aspects of the Purchase Agreement.

**C.      MSR Entered into An Employment Agreement with Paidela.**

23.     On the same day that MSR and Paidela executed the Purchase Agreement, they entered into the Paidela Employment Agreement.

24.     Section 2.2 of the Paidela Employment Agreement states as follows:

> During the Employment Term, the Executive shall devote substantially all of his business time and attention to the performance of the Executive's duties hereunder and will not engage in any other business, profession, or occupation for compensation or otherwise which would conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the Company.

25.     Section 6.1 of the Paidela Employment Agreement, entitled "Three-Year Non-Compete," states as follows:

> Executive agrees and acknowledges that he is familiar with the trade secrets and other information of a confidential or proprietary nature of the Company. Executive also agrees and acknowledges that the Company would be irreparably damaged if Executive were to provide services or to otherwise participate in the operations or business of any person competing with the business of the Company. Therefore, in consideration of the benefits provided hereunder, Executive agrees that during the Employment Period and continuing during the three (3) year period after the employment termination date of Executive's employment with the Company (the "**Restricted Period**"), Executive shall not to, directly or indirectly, either for himself, or itself or through any other person, as an employee, agent, consultant, director, equityholder, manager, member, co-partner or in any other individual or representative capacity, own, operate, manage, control, engage in, invest in, be employed by or participate in any manner in, act as an employee, consultant or advisor to, render services for (alone or in association with any person), permit his name to be used by any enterprise that engages in or participates in, or otherwise assist any person that engages in or owns, invests in, operates, manages or controls any business or activities that are directly or indirectly competitive with the business or the services provided by the Company (the "**Restricted Business**"). Nothing contained herein shall be construed to prevent Executive from owning less than one percent (1%) of the combined voting power of all issued and outstanding voting securities of any publicly held corporation whose stock is traded on a major stock exchange or quoted on NASDAQ.

26. Section 6.2 of the Paidela Employment Agreement, entitled "Three-Year Non-Solicitation of Business Relations," states as follows:

> Executive hereby agrees that during the Restricted Period, Executive shall not, directly or indirectly, through another person, as employee, agent, consultant, director, equityholder, manager, member, co-partner or in any other capacity, without the Company's prior written consent, solicit business from any person, business or entity, which is or was a client, customer, supplier, licensee, licensor or other business relation of the Company during the three (3) year period preceding the Executive's termination date, or from any successor in interest to any such person, business or entity, in any case, for the purpose of securing business or contracts related to the Restricted Business.

27. Section 6.3 of the Paidela Employment Agreement, entitled "Three Year Non-Solicitation and No-Hire of Employees," states as follows:

> During the Restricted Period, Executive shall not, directly or indirectly, as employee, agent, consultant, director, equityholder, manager, member, co-partner or in any other capacity, without the prior written consent of Company, employ, hire, engage, recruit or solicit for employment or engagement (other than by a general solicitation advertisement, posting or similar job solicitation process not targeting the employees of the Company), any person who is (or was during the two (2) year period preceding Executive's employment termination date, or the three (3) year period prior to the solicitation) employed or engaged by the Company with respect to the Company's business or a client or customer of such business, or otherwise seek to interfere with, influence or alter any such person's relationship with any of the foregoing; provided, that, notwithstanding the foregoing, Executive may hire any former employee of the Company if such hiring occurs at least two (2) years after such employee's final day of employment with the Company.

28. Section 6.4 of the Paidela Employment Agreement, entitled "Non-Disclosure Of Confidential Information," states as follows:

> The Executive agrees and covenants: (i) to treat all Confidential Information, as defined below, as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company, and, in any event, not to anyone outside of the direct employ of the Company, except as required in the performance of the Executive's authorized employment duties to the Company; and (iii) not to access or use any Confidential Information, and not to copy any documents,

records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company, except as required in the performance of the Executive's authorized employment duties to the Company.

29.     Paidela enjoyed significant compensation in the form of an annual salary, bonuses, and equity.  He earned an annual salary of $190,000 per year.  Under the "BONUS COMPENSATION" structure, which is Exhibit A to the Paidela Employment Agreement, Paidela was eligible for—and did earn—millions of dollars from MSR in compensation.

     (a)     In 2021, MSR paid Paidela $6,158,442.50 in compensation.

     (b)     In 2022, MSR paid Paidela $4,638,513.22 in compensation.

**D.     MSR Employs Satkuri, Donipathi, And Jutur to Work for The Acquired Companies.**

30.     On June 20, 2022, Donipathi entered into a renewed employment agreement with MSR for him to work in the role of Technical Sales Engineer for Synapsis.

31.     On February 22, 2021, Jutur entered into a renewed employment agreement with MSR for him to work in the role of Technical Sales Engineer for Synapsis.

32.     Satkuri entered into a renewed employment agreement with MSR for her to work in the human resources function for Riverpoint Management.

**E.     The Individual Defendants Formed VistalTech to Compete with MSR.**

33.     On March 3, 2022, VistalTech filed its Articles of Incorporation with the Illinois Secretary of State, identifying its initial registered office as 3200 North Lake Shore Drive, Apartment 903, Chicago, Illinois 60657.

34.     VistalTech's "About" tab on its website represents that, "VistalTech, a distinguished technology consulting company, excels in Web Development, Mobile App Development, Cloud Platforms, Software Development, and much more.  Our expertise extends to mitigating information system risks through top-notch Data Quality and regulatory compliance

solutions. Additionally, we offer a comprehensive range of enterprise workforce solutions, including Contingent Workforce, Full-time/Permanent Staffing, and Recruiting Process Outsourcing (RPO) services, tailored to meet the diverse needs of businesses." https://www.vistaltech.com/about/ (last accessed on April 22, 2024). Based on VistalTech's website, VistalTech offers services to some of the same customers as MSR.

35.     According to VistalTech's LinkedIn, "VistalTech is a leading provider of technology solutions and services specialized in Web Development, Mobile App Development, Cloud Platforms and Software Development. We also help companies address risks associated with their information systems by offering Data Quality and regulatory compliance solutions. We also provide a variety of enterprise workforce solutions like Contingent Workforce, Full-time/Permanent staffing, and Recruiting Process Outsourcing (RPO) services to diverse businesses."

36.     The services and products offered by VistalTech are directly competitive to the services offered by MSR and the Acquired Companies.

**F.     MSR Discovers that Defendants' Wrongfully Stole Its Business, Customers, And Employees.**

37.     On March 26, 2024, MSR received an anonymous tip that Paidela, Jutur, and Donipathi were directly competing against MSR (and the Acquired Companies) behind MSR's back.

38.      MSR began investigating VistalTech and its involvement in MSR's abysmal 2023 revenues and profits.

39.     MSR discovered that the Individual Defendants are working for and/or own VistalTech in various high-level capacities and are stealing MSR's business, customers, and employees.

### i.    VistalTech is owned and controlled by the Individual Defendants.

40.    On VistalTech's 2023 Annual Report filed with the State of Illinois on April 5, 2023, Satkuri is identified as VistalTech's Secretary.  At this time, Satkuri was still employed by Riverpoint Management, a company owned by MSR and managed by Paidela.

41.    On VistalTech's 2024 Annual Report filed with the State of Illinois on January 30, 2024, Satkuri is identified as VistalTech's Registered Agent as well as Secretary.  Donipathi is identified as VistalTech's President.  Jutur is identified as VistalTech's Director.  At this time, Satkuri was still employed by Riverpoint Management, and Donipathi and Jutur were still employed by Synapsis.

42.    MSR owns Riverpoint Management and Synapsis, and Paidela managed both of these companies until his termination for cause on April 22, 2024.

43.    In July 2022, MSF&W—an IT company in Illinois, and a potential customer of MSR's subsidiary Synapsis—exchanged e-mails with a representative at VistalTech at VistalTech's initiation for the placement of an IT expert from Synapsis for $65 per hour.  MSF&W later began to question why the IT expert was originally presented as an employee of Synapsis— but the Statement of Work was through VistalTech.  Specifically, MSF&W asked Paidela, "Please help us understand why Rama was presented as a Synapsis candidate but will now be running through Vistal Tech.  [¶]  We like Rama.  DOIT likes Rama.  We'd like to move forward with all of this but would like to better understand who we are working with."

44.    On July 18, 2022, MSF&W wrote to Paidela again regarding this placement, "It is getting a bit confusing.  Kapil's email is @riverpoint.com, and we were just introduced today to Vistal Tech.  We assumed Kapil works for Synapsis, as well as Rama.  We have done work with Synapsis in the past, and the candidates submitted were employees of Synapsis.  If you are

presenting us with candidates, if they are not Synapsis employees, I believe you should be transparent and let us know you are using subcontractors. We are required to list our subcontractors on all contracts, and also hold them accountable for all of the State/Federal requirements. This looks like three layers to me: Synapsis – Riverpoint – Vistal Tech. Is this Correct?" In response to this pushback, Paidela responded, "***We have 6 companies, and we try to build them evenly.*** No layers are involved here." (emphasis added).

45. Sensing Paidela's lies, and in further response, MSF&W inquired further, "When you say we, who are you talking about? You own Synapsis, correct? Are there other owners involved? Are all of these companies affiliated with Synapsis? Is Synapsis the parent company? Do you own Vistal Tech? I'm just trying to figure out who I'm doing business with. I think communication fell down here between Sam and Kapil. [¶] Sam told me Kapil worked for you. I'm not trying to be a pain, but I believe in full transparency, and because this is a State contract, I have to name the company that we are subcontracting with. Sam was not getting a straight answer, so I told him to reach out to you directly. ***I want to do business with Synapsis. I don't know these other companies, and I'm not sure I want to work with them without knowing who I'm working with.***" Paidela responded—falsely as to the Acquired Companies, but in a blatant concession as to VistalTech—"***I own all these companies.***" (emphasis added). Paidela was plainly transitioning Synapsis and Riverpoint customers—customers of MSR—to himself via VistalTech, apparently without customers' knowledge or consent.

46. On November 13, 2023, Jutur was on an e-mail in which a former MSR employee represented that VistalTech is a sister company to Synapsis as he was announcing his change in employment.

47.     In December 2023, Donipathi was setting up an IT expert placement from MSR to a customer.  When asked for a purchase order, Donipathi sent a purchase order signed between VistalTech and MSR's customer—bearing Paidela's name under VistalTech as its President.

       **ii.**     **Defendants are diverting significant business away from MSR and the Acquired Companies to VistalTech.**

48.     Defendants have conspired to syphon MSR's and the Acquired Companies' business to VistalTech.

49.     Rama Krishna Reddy Yella has been employed by Synapsis since 2018.  However, Paidela funneled the fees from Mr. Yella's services through Synapsis to VistalTech in September 2022 in the amount of $9,360.  Upon information and belief, this payment stemmed from Paidela's e-mails with MSF&W in which he agreed to contract Mr. Yella through Synapsis, after MSF&W confronted Paidela for attempting to contract Mr. Yella's services through VistalTech.  The Statement of Work between MSR's customer and Synapsis for Mr. Yella's services was signed by Paidela on July 21, 2022.  The Statement of Work between Synapsis and VistalTech for Mr. Yella's services was signed by Paidela on July 29, 2022.

50.     MSR was unaware of this or other instances of Paidela's transfer of customers and fees to VistalTech.  MSR discovered numerous instances in which Paidela used Synapsis as the initial contracting entity to engage with MSR's customers for the placement of MSR's employees, but later transferred those customer fees to VistalTech as a subcontractor.  A Synapsis "Contractor Agreement" between Synapsis and VistalTech was signed on March 4, 2022, by Paidela.

       (a)     From October 2022 through December 2023, Paidela arranged for Mounish Thatikonda—an individual who was employed by Synapsis from 2017 until October 2021 (i.e., pre- and post-acquisition of the Acquired Companies)—to perform work on behalf of Synapsis.  The arrangement with MSR's customer was with Synapsis but Paidela

subcontracted it to VistalTech. Paidela then caused Synapsis to pay VistalTech Mr. Thatikonda's rate of $92 per hour from October 2022 to December 2023, totaling $195,000. Upon information and belief, Paidela caused Mr. Thatikonda to resign from MSR so that these fees could be billed through VistalTech instead of Synapsis. The Statement of Work between Synapsis and VistalTech for Mr. Thatikonda's services was signed by Paidela on October 26, 2022.

(b)     Sandeep Bhimanapati was an employee of Synapsis from January 2018 through November 2022; however, business records indicate that from September 2022 to November 2023, Synapsis paid VistalTech a total of $176,000 for services attributable to Mr. Bhimanapati. Upon information and belief, Paidela caused Mr. Bhimanapti to resign from MSR so that these fees could be billed through VistalTech instead of Synapsis. The Statement of Work between Synapsis and "VTechinfo Inc." for Mr. Bhimanapti's services was signed by Paidela on February 25, 2023.

(c)     Rakesh Medagoni is a current employee of Synapsis and has been since August 2014; however, business records indicate that since February 2022, Synapsis has paid VistalTech over $92,000 for services attributable to Mr. Medagoni to date.

(d)     Ravikiran Pottimurthy is a current employee of Synapsis and has been since November 2019; however, business records indicate that since August 2023, Synapsis paid VistalTech over $86,000 for services attributable to Mr. Pottimurthy to date. The Statement of Work between Synapsis and VistalTech for Mr. Mr. Pottimurthy's services was signed by Paidela on June 30, 2023.

(e)     Taruna Sree Ganne is a current employee of Synapsis and has been since September 2022; however, business records indicate that since January 2023, Synapsis paid

VistalTech over $76,000 for services attributable to Mr. Ganne to date. The Statement of Work between Synapsis and VistalTech for Ms. Ganne's services was signed by Paidela on January 25, 2023.

(f)     Navaneeth Reddy Valle is a current employee of Synapsis and has been since December 2019; however, business records indicate that between July 2023 and September 2023, Synapsis paid VistalTech nearly $50,000 for services attributable to Mr. Navaneeth.

(g)     Sruthi Yammanuru was an employee of Synapsis from November 2022 through February 2024; however, business records indicate that from April 2022 to November 2022, Synapsis paid VistalTech over $45,000 for services attributable to Ms. Yammanuru. Upon information and belief, Ms. Yammanuru is now employed by VistalTech. Ms. Yammanuru is the wife of Defendant Jutur.

(h)     To date, MSR has also discovered that Synapsis employees Deepakkumar Patnala and Vamshi Chennuru were placed with MSR's customers through VistalTech. The Statement of Work between Synapsis and VistalTech for Mr. Patnala's services was signed by Paidela on May 17, 2023. The Statement of Work between Synapsis and VistalTech for Mr. Chennuru's services was signed by Paidela on November 20, 2023.

51.     Defendants used non-MSR employees for various MSR customer projects through VistalTech in the last few years for significant fees. Under normal circumstances, MSR would hire employees to fill these customer requests so that the business should have been MSR's—not subcontracted through VistalTech.

(a)     Pratyusha Melapindi for $169,100. Ms. Melapindi is the wife of Defendant Donipathi.

(b)     Yash Pratesh Desai for $127,281.    The Statement of Work between Synapsis and VistalTech for Mr. Desai's services was signed by Paidela on April 18, 2023.

(c)     Abdul Mannam Shaik for $62,156.50.

(d)     Yashwanth Nelakurthy for $38,440 and Mahita Pammi for $37,440.    The Statement of Work between MSR and VistalTech for Mr. Nelakurthy's and Ms. Pammi's services was signed by Paidela on July 19, 2023.

(e)     Satwinder Kaur for $26,250.   The Statement of Work between Synapsis and VistalTech for Mr. Kaur's services was signed by Paidela on June 9, 2023.

(f)     Nitin Sai Jalukuru for $25,790.   The Statement of Work between Synapsis and VistalTech for Mr. Jalukuru's services was signed by Paidela on September 20, 2023.

(g)     Venkata Sai Phaneesha Chilaveni for $19,410.   The Statement of Work between Synapsis and VistalTech for Ms. Chilaveni's services was signed by Paidela on October 23, 2023.

(h)     Goutham Chebrolu for $8,064.  The Statement of Work between Synapsis and VistalTech for Mr. Chebrolu's services was signed by Paidela on March 18, 2022.

(i)     Vamsi Krishna Suddapalli for $3,600 and Srivani Bailpati for $3,300.  The Statement of Work between MSR and VistalTech for Messrs. Suddapalli's and Bailpati's services was signed by Paidela on January 10, 2024.

52.     Beyond just wholesale diversion of customer fees paid to Synapsis to VistalTech under a fraudulent subcontractor arrangement, VistalTech also billed Synapsis for miscellaneous hourly fees for work performed by Synapsis employees.   Those invoices include bills from VistalTech that were backdated even before its formation in March 2022.  Tens of bills exist from

VistalTech charging Synapsis for work allegedly performed. The bills collectively total over a million dollars.

### iii. Defendants solicit MSR's employees to leave for VistalTech.

53. Defendants have and continue to solicit MSR's employees to leave the Acquired Companies and join VistalTech.

54. Through VistalTech's public H1B Labor Condition Applications ("LCA"), VistalTech has filed a total of 94 LCAs from 2022 through present. Out of the 94 LCAs filed, at least ***41 of those employees are currently employed by MSR and the Acquired Companies.*** These records indicate that Defendants are either (1) transferring current MSR employees to VistalTech, or (2) causing current MSR employees to concurrently work for VistalTech in a dual capacity.

55. Paidela's involvement in MSR's employees' moves to VistalTech is demonstrated by employees specifically naming him as a reference. An e-mail and letter from Rakesh Reddy Komala detailing his transfer to VistalTech shows Paidela's involvement.



56. Upon information and belief, Defendants have engaged in a pattern of affirmatively deleting their e-mails on their accounts with the Acquired Companies in an effort to destroy evidence related to their scheme to steal MSR's business on behalf of VistalTech.

57.     Upon information and belief, Defendants' scheme is to build VistalTech by stealing the business of the Acquired Companies and by gutting the same entities that Paidela sold to MSR for significant consideration.

58.     MSR brings this action against Defendants to put an end to their illegal scheme to raid MSR of its business, workforce, goodwill, and reputation.  MSR has suffered both money damages as well as irreparable harm based on Defendants' misconduct to date, particularly with respect to customer confusion.   MSR's reputation and competitive advantage have been irreversibly damaged as a result of Defendants' ongoing scheme of setting up VistalTech to directly compete with MSR, under the false premise that it is under the MSR umbrella with the Acquired Companies.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract against Individual Defendants)

59.     MSR realleges and incorporates the allegations contained in Paragraphs 1 through 58.

60.     The Purchase Agreement, Paidela Employment Agreement, and the remaining Individual Defendants' employment agreements each contain valid and enforceable non-compete, non-solicitation, and non-disclosure provisions (hereinafter, the "Restrictive Covenants").

61.     The Individual Defendants were bound by the Restrictive Covenants as part of the sale of the Acquired Companies to MSR and as part of their employment with the Acquired Companies.

62.     The Restrictive Covenants preclude the solicitation of MSR's customers or MSR's employees during the course of their employment at the Acquired Companies and for a reasonable temporal duration following the cessation of their employment—and, for Paidela, for seven years following MSR's acquisition of the Acquired Companies.

63. The Individual Defendants breached the Restrictive Covenants by soliciting MSR's customers and MSR's employees during their employment—and, for Paidela, within 7 years following MSR's acquisition of the Acquired Companies.

64. The Company fully performed under the contracts that house the Restrictive Covenants.

65. The Individual Defendants' breaches injured MSR because it lost valuable customers and employees; experienced declining revenue; experienced reputational harm, including MSR's reputation relating to its relationships with its financial institutions; and experienced increased costs to conduct the operations for which the Individual Defendants were responsible.

66. The Individual Defendants' breaches were the direct and proximate cause of MSR's injuries.

**SECOND CLAIM FOR RELIEF**

**(Breach of Fiduciary Duty against the Individual Defendants)**

67. MSR realleges and incorporates the allegations contained in Paragraphs 1 through 66.

68. As employees of MSR with broad responsibilities, wide-ranging authority, and plenary discretion with respect to their managerial job duties, the Individual Defendants owed fiduciary duties of loyalty to MSR. These fiduciary duties include, but are not limited to, refraining from (a) actively exploiting their positions within the corporation for their own personal benefits, (b) soliciting existing MSR's customers, and (c) soliciting MSR's employees.

69. The Individual Defendants actively exploited their positions within MSR and the Acquired Companies for their own personal benefit by soliciting key, current MSR customers for

VistalTech while they were still employed by MSR—and, for Paidela, within 7 years following MSR's acquisition of the Acquired Companies.

70.     The Individual Defendants continue to solicit MSR's customers and employees on behalf of VistalTech.

71.     The Individual Defendants owed fiduciary duties of loyalty to MSR not to hinder the ability of the company to conduct its business and to act in MSR's best interests.

72.     The Individual Defendants hindered the ability of MSR by commencing competition while they were still employees of MSR—and, for Paidela, within 7 years following MSR's acquisition of the Acquired Companies.

73.     MSR was damaged by the Individual Defendants' breach of their fiduciary duties through the loss of valuable customers, employees, and revenues, damage to its reputation and goodwill, and increased costs to conduct the operations for which the Individual Defendants were responsible, as well as non-economic damages, including but not limited to emotional distress.

74.     The Individual Defendants' breach of their fiduciary duties was the proximate cause of MSR's damages.

**THIRD CLAIM FOR RELIEF**

**(Tortious Interference with Prospective Economic Advantage against all Defendants)**

75.     MSR realleges and incorporates the allegations contained in Paragraphs 1 through 74.

76.     MSR had a reasonable expectation of entering into valid business relationships with each of its customers without any subcontracting or involvement whatsoever through VistalTech, a direct competitor.

77.     Defendants knew of MSR's expectations.

78.    Defendants purposefully interfered with MSR's prospective business relationships and prevented MSR's legitimate expectations from ripening into valid business relationships.

79.    Defendants conspired, while the Individual Defendants were still employed by MSR, to encourage MSR's customers and employees to terminate their relationship with MSR to join its competitor, VistalTech.

80.    MSR was damaged by Defendants' misconduct, including through the loss of its employees, customers, revenues, and economic opportunities with respect to current and prospective projects, increased costs to conduct the operations for which the Individual Defendants were responsible, as well as by its loss of goodwill and reputational damages and non-economic damages, including but not limited to emotional distress.

## FOURTH CLAIM FOR RELIEF

### (Tortious Interference with Contract against all Defendants)

81.    MSR realleges and incorporates the allegations contained in Paragraphs 1 through 80.

82.    MSR had valid and enforceable contracts with employees that included non-compete and non-solicitation provisions.

83.    Defendants were aware of MSR's contracts with employees.

84.    Defendants intentionally and unjustifiably induced those MSR employees to breach their contracts with MSR when it directed them to solicit MSR's customers and employees for its competitor, VistalTech.

85.    The MSR employees subsequently breached their contracts with MSR when they in fact did solicit MSR's customers and employees for its competitor, VistalTech.

86.    MSR was damaged by this misconduct, including through the loss of its employees, customers, the loss of economic opportunities with respect to current and prospective projects, and

increased costs to conduct the operations for which the Individual Defendants were responsible, as well as by its loss of goodwill and reputational damages and non-economic damages, including but not limited to emotional distress.

### FIFTH CLAIM FOR RELIEF

#### (Civil Conspiracy against all Defendants)

87.     MSR realleges and incorporates the allegations contained in Paragraphs 1 through 86.

88.     Defendants conspired to steal MSR's customers and employees on behalf of a direct competitor, VistalTech.

89.     Defendants acted willfully and without regard to the contractual rights enjoyed by MSR with its customers, employees, and with the Individual Defendants.

90.     There was a meeting of the minds with respect to the goal to be accomplished, as evidenced by Defendants' numerous actions in concert, deletion of e-mails, and the formation and operation of VistalTech.

91.     There were unlawful overt acts in furtherance of the conspiracy with each action that constituted a breach of the Restrictive Covenants, or inducement of the same, as well as the destruction of inculpatory evidence.

92.     As a result of Defendants' misconduct, MSR continues to suffer damages in the form of lost revenues, lost customers and employees, and increased costs to conduct the operations for which the Individual Defendants were responsible, as well as by its loss of goodwill and reputational damages and non-economic damages, including but not limited to emotional distress.

### SIXTH CLAIM FOR RELIEF

#### (Violation of the Illinois Uniform Deceptive Trade Practices Act by all Defendants)

93.    MSR realleges and incorporates the allegations contained in Paragraphs 1 through 92.

94.    815 ILCS § 510/2(a) of the Illinois Deceptive Trade Practices Act provides, *inter alia*, that "A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: (1) passes off goods or services as those of another; (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another; (4) uses deceptive representations or designations of geographic origin in connection with goods or services; (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; . . . (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

95.    815 ILCS § 510/1(5) of the Illinois Deceptive Trade Practices Act defines a "person" as "an individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership, unincorporated association, 2 or more of any of the foregoing having a joint or common interest or any other legal or commercial entity."

96.    815 ILCS § 510/3 provides that "[a] person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable" and that "if the court finds that he has willfully engaged in a deceptive trade practice," then "[c]osts or attorneys' fees or both may be assessed against a defendant[.]"

97.    Defendants have wrongfully passed off VistalTech's services as those of MSR by using the MSRs employees but billing the services as work done by VistalTech.

98.    Defendants' actions have caused confusion as to the source of the services customers have received, as evidence by e-mails from MSR's customer, MSF&W, attempting to understand which company would be performing the work for which it had contracted.

99.    Defendants' use of MSR's employees is likely to cause confusion as to the affiliation between MSR and VistalTech.

100.    This likelihood of confusion is enhanced by Paidela falsely claiming that he owns MSR's companies and VistalTech and the false representations that VistalTech is a sister company to Synapsis.

101.    Defendants have used deceptive representations as to the services provided to customers, including representations relating to overlapping ownership and through the use of MSRs employees who are also employees of VistalTech.

102.    Defendants have wrongfully represented that VistalTech has an affiliation with MSR that it does not have by using current and former MSR employees to complete work on behalf of VistalTech and by claiming that MSR's companies and VistalTech have overlapping ownership.

103.    Defendants' wrongful actions as alleged above create a likelihood of confusion and misunderstanding among MSR's customers as to the relationship between MSR's companies and VistalTech.

104.    Defendant's deceptive and misleading conduct constitute willful violations of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, *et seq.*

105.    As a result of Defendants' wrongful actions, MSR continues to suffer irreparable damages in the form of lost customers, employees, and revenue as well as loss of goodwill and reputational damages and non-economic damages, including but not limited to emotional distress.

## **PRAYER FOR RELIEF**

WHEREFORE, MSR respectfully requests that judgment be entered in its favor and against Defendants as follows:

- Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction against Defendants, enjoining them from competing with MSR and from soliciting its customers and employees;

- Awarding MSR damages in an amount to be proven at trial that include all damages MSR has suffered to date, including damages for loss of revenue, reputational harm, and emotional distress, as well as for future harm and a disgorgement of monies that Defendants have obtained as ill-gotten gains;

- Awarding MSR's attorney's fees and costs; and

- Awarding MSR such further relief as the Court deems just and proper under the circumstances.

Dated: April 22, 2024            Respectfully submitted,

MSR Technology Group, LLC

By: /s/ Matthew Klepper
Matthew Klepper
Jacob R. Clubb
DLA Piper LLP (US)
444 W. Lake Street, Suite 900
Chicago, IL 60606-0089
T 312.368.4000
E matthew.klepper@us.dlapiper.com
E jacob.clubb@us.dlapiper.com

Matthew J. Jacobs (*pro hac forthcoming*)
Troy A. Valdez (*pro hac forthcoming*)
Tom Lin (*pro hac forthcoming*)
Emily R. Margolis (*pro hac forthcoming*)
DLA Piper LLP (US)
555 Mission Street, Suite 2400
San Francisco CA 94105-2933
T 415.836.2500
E matt.jacobs@us.dlapiper.com
E troy.valdez@us.dlapiper.com
E tom.lin@us.dlapiper.com
E emily.margolis@us.dlapiper.com

*Counsel for Plaintiff*
*MSR Technology Group, LLC*