IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MSR TECHNOLOGY GROUP, LLC, | ) | |
| | ) | |
| Plaintiff | ) | |
| and Counter-Defendant, | ) | |
| | ) | No. 24-cv-03203 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| VISTALTECH, INC., et al., | ) | |
| | ) | |
| Defendants | ) | |
| and Counter-Plaintiff. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff and Counter-Defendant MSR Technology Group, LLC ("MSR") specializes in

information technology ("IT") consulting. In November 2020, MSR entered into an agreement

with Defendant Mastan Reddy Paidela to purchase his five IT-consulting companies ("Purchase

Agreement"). Following the acquisition, Paidela became an employee of MSR. Sometime later,

MSR claims to have discovered that Paidela and three other now-former MSR employees,

Defendants Vagdevi Satkuri, Mouli Prasad Donipathi, and Kapileswar Reddy Jutur, started a

new company, Defendant and Counter-Plaintiff VistalTech, Inc. ("VistalTech"), that directly

competes with MSR in the IT field. As a result, MSR brought the present lawsuit. In the course

of discovery, MSR obtained information it claims shows that Paidela fraudulently induced MSR

to purchase his companies at an artificially inflated price. Thus, the now-operative First

Amended Complaint ("FAC") includes a claim against Paidela for fraudulent inducement, as

well as claims alleging that Donipathi and Jutur breached the restrictive covenants in their

respective employment agreements with MSR. Along with its answer to the FAC, VistalTech has

asserted counterclaims against MSR. Now before the Court are Donipathi's and Jutur's motions

to dismiss the breach of contract claims against them pursuant to Federal Rule of Civil Procedure

12(b)(6), Paidela's motion for judgment on the pleadings as to the fraudulent inducement claim pursuant to Federal Rule of Civil Procedure 12(c), and MSR's Rule 12(b)(6) motion to dismiss VistalTech's counterclaims. For the reasons that follow, MSR's motion is granted but the other motions are denied.

## BACKGROUND

The FAC alleges as follows.[1]

MSR is an IT consulting company that places its employees with end-user customers to perform various IT staffing services. (FAC ¶¶ 3, 13, Dkt. No. 148.) In November 2019, MSR reached out to Paidela, who was the owner and president of five IT-consulting companies ("Acquired Companies"), upon learning that Paidela was interested in selling those companies. (*Id.* ¶¶ 5, 14–15.) As part of the parties' due diligence for the acquisition, Paidela obtained valuations for each of the Acquired Companies. (*Id.* ¶ 16.) However, Paidela intentionally provided false information and made material omissions in connection with the valuation process. (*Id.*) Among other things, Paidela failed to disclose certain of the Acquired Companies' liabilities and debts. (*Id.* ¶¶ 23–24.) Further, Paidela took steps to conceal the various ways he had mismanaged the Acquired Companies to enrich himself and his friends. (*Id.* ¶¶ 27–45.) Some of his misconduct also ran afoul of tax and immigration laws. (*Id.* ¶¶ 38–41.) Paidela's various misrepresentations and omissions resulted in artificially inflated valuations for the Acquired Companies. (*Id.* ¶¶ 16, 22.) MSR relied on those artificially inflated valuations in proceeding with the acquisition process. (*Id.*)

---

[1] The Court summarizes the factual allegations of the FAC for purposes of the present motions but, of course, does not vouch for their veracity in doing so.

On November 27, 2020, MSR and Paidela entered into the Purchase Agreement, with MSR agreeing to pay Paidela approximately $36 million over a three-year period to acquire the operations, goodwill, and employees of the Acquired Companies. (*Id.* ¶¶ 5, 17–18.) Under the Purchase Agreement, Paidela made several representations and warranties regarding the Acquired Companies. (*Id.* ¶ 19.) Those representations included his confirmation that, as of the closing date, the books and records of the Acquired Companies were complete and accurate; all the Acquired Companies' liabilities, contracts, commitments, guaranties, and indebtedness had been disclosed; and the Acquired Companies were in compliance with all relevant laws. (*Id.* ¶¶ 22–23, 29, 36.) But Paidela knew at the time of the Purchase Agreement's execution that those representations and warranties were false. (*Id.*) Paidela also signed a separate employment agreement with MSR under which he agreed to remain in his position as President of each the Acquired Companies. (*Id.* ¶¶ 5, 14, 17, 20.) After the Purchase Agreement closed, he continued to mismanage the Acquired Companies to the benefit of himself and his friends, and he used his position as President to conceal that wrongdoing from MSR. (*Id.* ¶¶ 21, 25, 27, 31–35, 42, 46.)

In March 2024, MSR received what it describes as "an anonymous tip" that Paidela was directly competing with MSR for business through VistalTech, a company Paidela allegedly started with Satkuri, Donipathi, and Jutur—all of whom were employed by MSR at the time. (*Id.* ¶¶ 5–9, 74–76.) Up to that point, Donipathi had been working for one of the Acquired Companies, Synapsis, Inc. ("Synapsis"), first as a Software Engineer under an employment agreement into which he and MSR entered on April 30, 2020, and then as a Technical Sales Engineer under a renewed employment agreement into which he and MSR entered on June 20, 2022. (*Id.* ¶¶ 56–57.) Likewise, Jutur worked for Synapsis as a Technical Sales Engineer under an employment agreement with MSR that they entered into on February 22, 2021. (*Id.* ¶¶ 62–63.)

3

Donipathi's and Jutur's employment agreements included substantially identical non-compete and non-solicitation covenants. (*Id.* ¶¶ 56–59, 62–64.) Despite their employment agreements containing a covenant prohibiting them from taking on a role with an MSR competitor, a 2024 filing with the State of Illinois identified Donipathi as VistalTech's president and Jutur as the company's Director. (*Id.* ¶¶ 59, 64, 79.) And beginning around March 2022, Paidela, Donipathi, and Jutur began using their positions at the Acquired Companies to divert work from MSR to VistalTech. (*Id.* ¶¶ 94–100.) They also began soliciting MSR's employees to leave their positions at MSR and join VistalTech. (*Id.* ¶¶ 101–104.)

After further investigation, MSR terminated Paidela, Satkuri, Donipathi, and Jutur for cause on April 22, 2024. (*Id.* ¶¶ 5, 7–9, 80.) MSR then brought the present lawsuit, with its FAC now asserting claims against Paidela for fraudulent inducement and fraud, claims against Paidela, Donipathi, and Jutur for breach of contract, claims against Paidela, Donipathi, Jutur, and Satkuri for breach of fiduciary duty, a claim against VistalTech for aiding and abetting the alleged breach of fiduciary duty, and claims against all Defendants for tortious interference with prospective economic advantage, tortious interference with contract, civil conspiracy, and violations of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.* In addition, VistalTech asserts counterclaims against MSR for breach of contract and account stated. (Dkt. No. 182.)

## DISCUSSION

Now before the Court are Donipathi and Jutur's respective motions to dismiss the breach of contract claims brought against them, MSR's motion to dismiss VistalTech's counterclaims, and Paidela's motion for judgment on the pleadings as to the fraudulent inducement claim. Because Donipathi and Jutur arguments for dismissing the breach of contract claims almost entirely overlap, the Court addresses their motions together. It then turns to consider whether

4

VistalTech has pleaded viable counterclaims against MSR. The Court then concludes by determining whether Paidela is entitled to judgment on the pleadings with respect to the fraudulent inducement claim against him.

### I. Donipathi's and Jutur's Rule 12(b)(6) Motions

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

Here, Donipathi and Jutur each argue for dismissal based on the purported unenforceability of the restrictive covenants in their respective employment agreements. In Section 9 of Donipathi's original and renewed employment agreements and Jutur's employment agreement, each Defendant agreed to refrain from soliciting MSR's customers or employees or from otherwise competing with MSR[2] as follows:

> The Employee agrees that the Employee will not, without the prior written consent of [MSR], for a period beginning on the Effective Date and continuing for a period of two (2) years after termination of the employment with [MSR] for any reason,

---

[2] Both Donipathi and Jutur note in their reply briefs in support of their motions to dismiss that their employment agreements were with Synapsis, and they argue that the Court should not conflate Synapsis with MSR when analyzing the restrictive covenants. (Donipathi's Reply in Supp. of Mot. to Dismiss at 2, Dkt. No. 203; Jutur's Reply in Supp. of Mot. to Dismiss at 2, Dkt. No. 204.) While Synapsis and the other Acquired Companies are each subsidiaries of MSR (FAC ¶¶ 5, 17), and thus perhaps should be treated as separate entities, no Defendant has objected to MSR's effort to enforce as the sole Plaintiff in this action agreements to which only Synapsis or another Acquired Company is a party. And MSR alleges that, following the execution of the Purchase Agreement, employees of the Acquired Companies became employees of MSR. (*Id.*) Thus, for present purposes, the Court treats MSR as the relevant employer.

within any state of the United States of America or territory of Canada, directly or indirectly:

a.      solicit, induce or persuade any employee or contractor of [MSR] to leave employment with [MSR] for any reason;

b.      hire or retain or assist others in hiring or retaining any individuals who are employees or contractors of [MSR] or who were employees or contractors at any time during the twelve (12) month period prior to the termination or cessation of the Employee's employment with [MSR];

c.      solicit, contact, call on or take away any customer of [MSR], or perform or supply any services or products (as an employee, contractor or otherwise) to such customers. The term "customer" for purposes of this Section shall include but is not limited to, a person or entity to whom: (a) [MSR] has provided goods or services, either directly, through its clients or middle vendors; (b) [MSR] has submitted a proposal to provide goods or services; or the Employee was introduced to, by or through [MSR], its clients or middle vendors, or has become acquainted with by working for [MSR] or its clients;

d.      induce or persuade or assist others in inducing or persuading any such customer to reduce or discontinue doing business with [MSR] or to purchase from another person or entity goods or services supplied or which could be supplied by [MSR]; or

e.      own, manage, control, operate, participate in, consult with, render services to (as an officer, director, employee, partner, consultant or in any similar role) or to have any other interest as a stockholder, lender or financial or beneficial interest in any customer; provided, however, that ownership of not more than two percent (2%) of any class of securities traded actively, over-the-counter or through a stock exchange shall not violate this subparagraph (e);

f.      interfere with any business relationship between [MSR] and any other person or entity.

The provisions of this Section 9 shall survive the termination of this Agreement.

(FAC, Ex. C, Apr. 30, 2020 Donipathi Employment Agreement § 9, Dkt. No. 148-3; *see also* FAC, Ex. D, June 20, 2022 Donipathi Renewed Employment Agreement § 9, Dkt. No. 148-4; FAC, Ex. E, Feb. 22, 2021 Jutur Employment Agreement § 9, Dkt. No. 148-5.) MSR's breach of contract claims allege that Donipathi's and Jutur's work with VistalTech breached these non-compete and non-solicitation obligations in various ways. However, Donipathi and Jutur argue

that the restrictive covenants in their employment agreements are overbroad and therefore unenforceable.

"Because Illinois courts abhor restraints on trade, restrictive covenants are carefully scrutinized." *LKQ Corp. v. Rutledge*, 96 F.4th 977, 981–82 (7th Cir. 2024) (internal quotation marks omitted).[3] For a restrictive covenant to be upheld, it must be supported by consideration and the restraint imposed must be reasonable. *Reliable Fire Equip. Co. v Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011). A restrictive covenant will be found reasonable only if it "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor; and (3) is not injurious to the public." *Id.*[4] "Baked into this totality-of-the-circumstances review is 'the propriety of the limitations in terms of their length in time, their territorial scope, and the activities that they restrict.'" *LKQ Corp.*, 96 F.4th at 982 (quoting *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 526 (Ill. App. Ct. 2007)). Given the fact-specific analysis the inquiry entails, it is usually inappropriate to find a restrictive covenant unenforceable at the motion-to-dismiss stage. *E.g.*, *SCB Derivatives, LLC v. Bronson*, No. 1:22-CV-2742, 2023 WL 6388229, at *5 (N.D. Ill. Sept. 29, 2023). Only a restrictive covenant that is "patently unreasonable" may be

---

[3] All three employment agreements state that they shall be construed and governed by Illinois law, and there is no dispute among the parties that Illinois law applies. (Apr. 30, 2020 Donipathi Employment Agreement § 12(h); June 20, 2022 Donipathi Renewed Employment Agreement § 12(h); Feb. 22, 2021 Jutur Employment Agreement § 12(h).)

[4] Donipathi contends that his renewed employment agreement is governed by the amended Illinois Freedom to Work Act, 820 ILCS 90/1 *et seq.*, as it was executed on June 20, 2022, after the amendment's January 1, 2022, effective date. As this Court previously observed, "the Illinois Freedom to Work Act was amended to codify the common-law principles used by Illinois courts to assess the validity of restrictive employment covenants." *MSR Tech. Grp., LLC v. VistalTech, Inc.*, No. 24-cv-03203, 2025 WL 1744730, at *3 (N.D. Ill. Mar. 17, 2025). Thus, the Court finds that the potential applicability of the amended Act does not change its enforceability analysis.

struck down as facially invalid on a Rule 12(b)(6) motion. *Mazzetta Co., LLC v. Simpson*, No. 24-cv-2488, 2025 WL 777534, at *4 (N.D. Ill. Mar. 11, 2025).

While a close question, the Court is ultimately unable to conclude that the non-solicitation and non-compete provisions in Donipathi's and Jutur's employment agreements are patently unreasonable. Rather, there are questions as to reasonableness that cannot be answered without an evidentiary record. First, the Court finds that MSR has legitimate business interests in protecting confidential information and maintaining a stable workforce, both of which plausibly justify the restrictive covenants. *See Arredondo*, 965 N.E.2d at 403 (identifying "the employee's acquisition of confidential information through his employment" as a relevant consideration in the legitimate-business interest analysis); *Instant Tech., LLC v. DeFazio*, 40 F. Supp. 3d 989, 1013 (N.D. Ill. 2014) ("In certain circumstances, maintaining stability within an employer's workforce can be a legitimate business interest and thus the basis for a restrictive covenant."). On the other hand, whether a business has a protectible interest in its customer relationships will vary depending on the level of permanence of the relationships. *Arredondo*, 965 N.E.2d at 403. Relevant considerations include "longevity of relationships," "the specialized nature of services, where, for example, a business engenders 'loyalty by providing a unique product or personal service,'" and "the difficulty of retaining new clients, including the requisite amount of time and money invested in that process." *Dressander v. Simplicity Fin. Mktg., Inc.*, No. 19-cv-1395, 2023 WL 2561733, at *10 (N.D. Ill. Mar. 17, 2023) (quoting *Lawrence & Allen, Inc. v. Cambridge Hum. Res. Grp., Inc.*, 685 N.E.2d 434, 444 (Ill. App. Ct. 1997)). Given the nature of the IT-consulting services MSR provides its customers, the Court requires an evidentiary record to assess the protectability of its customer relationships.

According to Donipathi and Jutur, the restrictive covenants' temporal and geographical scopes are overly broad in relation to any legitimate business interest MSR might have. But again, the reasonableness of a restrictive covenant's temporal or geographic scope depends on the particular facts and circumstances. Thus, courts have declined to find a two-year temporal restriction like the one in Donipathi's and Jutur's covenants unreasonable at the pleading stage. *E.g.*, *NAV Consulting, Inc. v. Kumawat*, No. 1:22-CV-03624, 2023 WL 6388728, at \*4 (N.D. Ill. Sept. 29, 2023) ("Evaluating first the two-year length of the noncompete restriction, the Court holds that—at least at the pleading stage—this time period is reasonable based on the allegations set forth in the Verified Complaint."). And although the restrictive covenants here have a broad geographic scope, covering the United States and Canada, such a scope may nonetheless be reasonable if "the restricted area is coextensive with the area in which the employer is doing business." *Id.* (quoting *Cambridge Eng'g*, 879 N.E.2d at 523); *see also SCB Derivatives*, 2023 WL 6388229, at \*6 ("The covenant's reach also reflects the global nature of Defendants' work as brokers in a global market for US Ethanol."). The Court cannot discern from the allegations of the FAC the territorial reach of MSR's business and is therefore unable to conclude that the geographic scope of the restrictive covenants is overbroad at this stage.

Finally, Donipathi and Jutur claim that the prohibitions against them soliciting or working with MSR customers is so broad as to effectively preclude them from doing IT-consulting work in the United States and Canada in any capacity for the two-year duration of those covenants. In considering restrictions on a former employee's ability to contact their former employer's customers, "courts have held that non-solicitation provisions that cover individuals with whom the former employee never had contact are overbroad." *League Corp. v. Khan*, No. 24 C 7015, 2025 WL 1305281, at \*5 (N.D. Ill. May 6, 2025); *see also Cambridge*

9

*Eng'g*, 879 N.E.2d at 528 ("[C]ourts are reluctant to enforce provisions that prohibit former employees from servicing customers that they never had contact with while working for their original employer."). Such a non-solicitation restriction will often be found to extend "far broader than necessary to protect [an employer's] interest in preventing its former employee from abusing the specific client relationships he built up during his time with the company." *AssuredPartners, Inc. v. Schmitt*, 44 N.E.3d 463, 474 (Ill. App. Ct. 2015) (internal quotation marks omitted).

As used in Donipathi's and Jutur's restrictive covenants, a customer includes any person or entity to whom MSR "has provided goods or services" or to whom MSR "has submitted a proposal to provide goods or services." (*E.g.*, Apr. 30, 2020 Donipathi Employment Agreement § 9(c).) In this way, the plain language of the definition is expansive and not limited only to those customers with whom Donipathi and Jutur worked during their tenure at MSR.[5] Still, the Court believes that the degree of hardship that the non-solicitation restriction imposes on Donipathi and Jutur cannot be determined without evidence; the Court cannot determine based on the FAC alone whether the non-solicitation covenants constrict the universe of potential customers for Donipathi and Jutur's IT-consulting services to the point of effectively barring them from working in the field. *See Creative Fin. Staffing LLC v. Kubacki*, No. 22-cv-00488, 2025 WL 896915, at *7 (N.D. Ill. Mar. 24, 2025) ("In at least some situations, Illinois courts have upheld broadly drafted non-solicitation covenants that did not limit their reach to only customers with whom the bound employee interacted."). Moreover, open questions as to the degree of protectability of MSR's customer relationships and the geographic scope of its

---

[5] To be sure, the restrictive covenants' definition of "customer" encompasses individuals and entities who the employee was introduced to or became acquainted with through their work with MSR, but that language is written in such a way as to add to the definition of customer and rather than qualify it.

business leads the Court to conclude that it needs a more fulsome record before it can determine whether the non-solicitation covenants are unreasonably expansive.

In short, to determine the reasonableness of the restrictive covenants in Donipathi's and Jutur's employment agreements, the Court requires a more developed evidentiary record. For that reason, the Court denies their motions to dismiss the breach of contract claims against them.

## II.      MSR's Motion to Dismiss VistalTech's Counterclaims

When VistalTech answered MSR's original complaint, it also asserted counterclaims against MSR for breach of contract and account stated. This Court subsequently granted MSR's motion to dismiss those counterclaims (Dkt. No. 131), holding that the breach of contract counterclaim failed because VistalTech failed to plead adequately the existence of a valid and enforceable contract by providing only vague allegations regarding the subcontracts that were supposedly breached. And because an account stated claim is just a form of proving damages for the breach of a promise to pay on a contract, the Court found that the account stated claim fell along with the breach of contract claim. In its answer to MSR's FAC, VistalTech pleads amended counterclaims for breach of contract and account stated. And MSR again moves to dismiss those amended counterclaims as insufficiently pleaded.

In an effort to address the original counterclaims' deficient allegations as to the existence of any specific contract between VistalTech and MSR, VistalTech now alleges that VistalTech entered into a Master Services Agreement with MSR on March 4, 2022, which memorialized the parties' subcontracting arrangement. (VistalTech's Am. Countercls. ¶¶ 2–3, Dkt. No. 182.) VistalTech attaches that Master Services Agreement as an exhibit to its counterclaims, along with various statements of work that VistalTech allegedly performed for MSR under that agreement. (VistalTech's Am. Countercls., Ex. A, Dkt. No. 182.) To show VistalTech's performance under the Master Services Agreement, VistalTech also attaches numerous invoices

11

from between 2023 and 2024 that MSR paid in full. (VistalTech's Am. Countercls., Ex. B., Dkt. No. 182.) And to show MSR's breach, VistalTech attaches unpaid invoices from 2024 that it sent to MSR. (VistalTech's Am. Countercls., Ex. C, Dkt. No. 182.)

While the Court finds that VistalTech has plausibly pleaded the existence of a contract between it and MSR by attaching the Master Services Agreement, its breach of contract counterclaim still fails because it does not adequately allege a breach by MSR. *E.g.*, *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (explaining that a plaintiff must allege a breach by the defendant to state a claim for breach of contract in Illinois). Essentially, VistalTech tries to allege that MSR breached the Master Services Agreement with documents showing that there existed a subcontracting arrangement between MSR and VistalTech, that MSR paid VistalTech for certain invoiced work, and that MSR later stopped paying VistalTech's invoices for other work. But neither the allegations in the counterclaim nor the attached exhibits actually connect the unpaid invoices to MSR's breach of any obligation under the Master Services Agreement. Indeed, the counterclaims are conspicuously silent as to MSR's obligations; VistalTech simply alleges that the attached Master Services Agreement and statements of work show the existence of a contract and then skips ahead to allege that MSR breached the contract by failing to pay VistalTech's invoices beginning in 2024. (VistalTech's Am. Countercls. ¶¶ 3–5, 11.) Nor does the attached Master Services Agreement provide any additional insight as to MSR's purported breach. While the Master Services Agreement sets forth VistalTech's obligations, it states that the work to be performed under the agreement will be set out in separate purchase orders attached to the Master Services Agreement. (VistalTech's Am. Countercls., Ex. A.) VistalTech claims that the statements of work it attaches are the referenced purchase orders. But even accepting that claim, VistalTech still fails to allege how MSR breached any term of

those statements of work or even connect the statements of work to the unpaid invoices that VistalTech attaches of proof of MSR's breach.

Because VistalTech fails to give MSR fair notice of how it breached the Master Services Agreement, its breach of contract counterclaim once again fails. *E.g. US Dealer License, LLC v. US Dealer Licensing LLC*, No. 19 C 3471, 2019 WL 7049927, at \*4 (N.D. Ill. Dec. 23, 2019) (explaining that, to plead a breach of contract claim, a plaintiff "must at least place the defendant on fair notice of the contractual duty it breached" (internal quotation marks omitted)). And because an account stated claim is "merely a form of proving damages for the breach of a promise to pay on a contract," VistalTech's failure to plead what promise MSR breached precludes it from maintaining its account stated counterclaim. *Dreyer Med. Clinic, S.C. v. Corral*, 591 N.E.2d 111, 114 (Ill. App. Ct. 1992) Accordingly, the Court grants MSR's motion to dismiss VistalTech's counterclaims.

### III.     Paidela's Motion for Judgment on the Pleadings

Finally, the Court turns to consider Paidela's motion for judgment on the pleadings on the fraudulent inducement claim. Rule 12(c) allows a party to move for judgment on the pleadings after the filing of the complaint and answer. *See* Fed. R. Civ. P. 12(c); *Supreme Laundry Serv., LLC v. Hartford Cas. Ins. Co.*, 521 F.3d 743, 746 (7th Cir. 2008). A Rule 12(c) motion is governed by the same standards as a Rule 12(b)(6) motion. *Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012). Thus, the Court must take all well-pleaded allegations as true and draw all reasonable inferences in the non-moving party's favor. *Id.* "[T]he motion must only be granted when it appears beyond doubt that the opposing party cannot prove any facts that would

13

support [its] claim for relief." *River Vill. West LLC v. Peoples Gas Light & Coke Co.*, 618 F. Supp. 2d 847, 850 (N.D. Ill. 2008) (internal quotation marks omitted).

Paidela contends that the fraudulent inducement claim is simply a breach of contract claim by another name. In particular, he argues that the fraudulent inducement claim is based entirely on Paidela's alleged misrepresentations regarding the Acquired Companies' financial condition and liabilities. Because those misrepresentations were inconsistent with the representations and warranties in the Purchase Agreement as to those same matters, a claim based on those misrepresentations must be for breach of contract. Simply put, Paidela asserts that the claim MSR labels as fraudulent inducement is actually nothing more than a claim that Paidela violated the Purchase Agreement's representations and warranties. Yet the Purchase Agreement sets out a specific procedure that MSR must follow to obtain indemnification for breaches of the agreement's representations and warranties. (FAC, Ex. A, Purchase Agreement § 7.2, Dkt. No. 148-1.) Further, the Purchase Agreement contains a survival clause providing that all but one of the representations and warranties relevant here expire eighteen months after the Purchase Agreement's closing. (*Id.* § 7.1.) And Paidela argues that MSR did not follow the Purchase Agreement's procedures for holding him liable for any breaches of representations and warranties, and first asserted its claim arising out of such alleged breaches well outside the eighteen-month survival period. For those reasons, Paidela contends that the Court must enter judgment on the pleadings in his favor as to the FAC's fraudulent inducement claim.

Because Paidela's basis for judgment on the pleadings depends on the applicability of the Purchase Agreement's indemnification procedures and survival clause, the Court first determines whether MSR's fraudulent inducement claim is, in fact, just an ordinary claim for breach of contract. To answer that question, the Court looks to Delaware law—that is the governing state

14

law chosen in the Purchase Agreement and neither party disputes its applicability here. (Purchase Agreement § 10.11); *see NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 306 (7th Cir. 2018) ("[I]n Illinois, tort claims that are dependent upon the contract are subject to a contract's choice-of-law clause regardless of the breadth of the clause." (internal quotation marks omitted)). "Delaware law holds that a plaintiff cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations." *Osram Sylvania Inc. v. Townsend Ventures, LLC*, No. 8123-VCP, 2013 WL 6199554, at *16 (Del. Ch. Nov. 19, 2013) (internal quotation marks omitted). Put differently, a fraud claim must do more than "add[] the term 'fraudulently induced' to a complaint that states a claim for breach of contract." *Id.* Instead, a fraud claim will only be viable if it "is based on conduct that is separate and distinct from the conduct constituting breach. Allegations that are focused on *inducement* to contract are 'separate and distinct' conduct." *ITW Glob. Invs. Inc. v. Am. Indus. Partners Cap. Fund IV, LP*, No. N14C-10-236 JRJ CCLD, 2015 WL 3970908, at *6 (Del. Super. Ct. June 24, 2015) (internal quotation marks omitted). In speaking of allegations of inducement, courts find actionable "inducement to contract because of alleged fraudulent conduct occurring *prior* to entering the contract" as distinguished from "alleged fraud based on the *performance* of a contract." *Id.*; *see also Aviation W. Charters, LLC v. Freer*, No. N14C-09-271 WCC CCLD, 2015 WL 5138285, at *6 (Del. Super. Ct. July 2, 2015) ("Critically, any alleged fraud occurred *before* the parties entered into the [contract]. Therefore, Plaintiff's claim for fraudulent inducement . . . is not barred by the bootstrapping doctrine.").

Here, the fraudulent inducement claim in the FAC is based on allegations Paidela's misrepresentations made prior to the execution of the Purchase Agreement for the purpose of inducing MSR to execute that agreement. (FAC ¶¶ 16, 19, 22–24, 27–30.) And Paidela allegedly

15

knew that his representations regarding the Acquired Companies were false at the time he signed the Purchase Agreement. (*Id.* ¶¶ 29, 36.) Delaware courts have found the anti-bootstrapping rule does not preclude a fraud claim in such circumstances. *E.g.*, *Levy Fam. Invs., LLC v. Oars + Alps LLC*, No. 2021-0129-JRS, 2022 WL 245543, at *8 (Del. Ch. Jan. 27, 2022) ("[T]he anti-bootstrapping rule does not prevent parties from bringing a fraud claim if . . . the plaintiff alleges the seller knowingly made false contractual representations [or] the conduct occurs prior to the execution of the contract and thus with the goal of inducing the plaintiff's signature and willingness to close on the transaction." (internal quotation marks omitted)); *see also Osram*, 2013 WL 6199554, at *16 ("[The plaintiff] has pointed to specific misrepresentations by Sellers, including misrepresentations about the sales results and financial condition of the Company made ***before*** the Execution of the [contract]. For this reason, I find that [the plaintiff's] fraud claim is not a mere bootstrap of its breach of contract claim."). Thus, the Court concludes that MSR's fraudulent inducement claim is not an improperly bootstrapped claim for breach of the Purchase Agreement's representations and warranties. That being the case, the claim is not subject to the Purchase Agreement's indemnification procedures and survival clause. Accordingly, the Court denies Paidela's motion for judgment on the pleadings.

**CONCLUSION**

For the foregoing reasons, Donipathi's and Jutur's motions to dismiss Count III of the First Amended Complaint (Dkt. Nos. 176, 178) and Paidela's motion for judgment on the pleadings as to Count I of the First Amended Complaint (Dkt. No. 193) are denied. MSR's motion to dismiss VistalTech's amended counterclaims (Dkt. No. 186) is granted. VistalTech's counterclaims are dismissed.

ENTERED:

Dated: March 21, 2026

Andrea R. Wood
United States District Judge

17